HENRY W. DOREMUS et al.*

*v.*

THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON.

[Filed March 26th, 1904.]

1. The act of 1903, entitled "An act to relieve from pollution the rivers and streams within the Passaic Valley sewerage district," &c., is not a bar to the right of riparian owners whose lands are below the point of pollution to have an injunction against or compensation from the city of Paterson upon the principle laid down in *Simmons* v. *Paterson*, 60 N. J. *Eq.* (*15 Dick.*) *385.*

2. If a bill by husband and wife, filed in respect to an injury to the wife's land, does not show that there is issue, upon the birth of which the husband would become entitled to an estate by the curtesy consummate on her death, such bill is demurrable. If such bill should show the birth of issue and an injury to the husband's right, the proper practice would be to make him defendant, he being a necessary party thereto.

On demurrer to amended bill.

*Mr. George S. Hilton,* for the demurrant.

*Mr. Sherrerd Depue,* for the complainants.

*This opinion was omitted from its proper place.

STEVENS, V. C.

The defendant demurs to the amended bill. The case stands thus. In *Simmons* v. *Paterson,* 60 *N. J. Eq.* (*15 Dick.*) *385,* on information and bill filed, it was held that Jersey City had no standing to restrain the city of Paterson from polluting the Passaic river, but that if the riparian owners would, in the language of Mr. Justice Van Syckel, "amend their bill or file a new bill asking for an injunction, unless the city would consent to make such compensation for the diminution in the value of their lands as should be ascertained to be just, such equitable relief could be given to them."

Acting on this suggestion, the riparian owners did file a new bill, in which, however, were joined co-complainants not only riparian owners, properly so called, but two other classes of persons, namely, those whose lands adjoined, not the Passaic river, but the artificially constructed Dundee canal, the waters of which were drawn from the river, and certain lessees of mill power, to whom the Dundee company had leased water rights. I thought that under the authority conferred upon the Dundee company by its charter, which empowered them to lease rights in gross to water power, these two latter classes of persons were entitled to have those rights protected, the pollution of the stream being as injurious to them as to the riparian owners themselves. On appeal the court of errors and appeals adjudged otherwise. Mr. Chief-Justice Gummere said: "In the case now under consideration the city of Paterson is not seeking to acquire any right of the lessees or grantees of a lower riparian owner. They concede that such lessees and grantees have rights, * * * but they contend that those rights are subordinate to the city's right to vent its sewage into the stream. This contention, in our opinion, is sound." The right of the riparian owner properly so called "to an injunction restraining the pollution of the river by the appellants, unless the latter make just compensation to him for the diminution in the value of his property occasioned thereby," was expressly reaffirmed.

Notwithstanding this reaffirmance the argument of the counsel of the city was largely based upon the assumption that the decision was erroneous. As, however, it cannot, at least, be ques-

tioned here, I shall only notice those new points which have not been discussed before and which have not been concluded by the judgment of the court of review.

Counsel contends in the first place that the act of 1903 (*P. L. 1903 p.* 777) has taken away the complainant's right to an injunction, or, at the election of the city, to compensation. The argument on this act is that inasmuch as it authorizes the construction of a trunk sewer to commence at or near the valley of rocks in Paterson and to extend into New York bay, this sewer, when constructed, will afford an outlet for Paterson's sewage, and the nuisance which injuriously affects complainants' property will cease. His conclusion is that this being so, the court either cannot or ought not to exercise its injunctive power. The argument necessarily rests upon the assumption that the sewer will be constructed, and that Paterson will use it. Counsel for complainants suggests that Paterson, while making this argument here, is contesting the constitutionality of the act in the supreme court. He does not ask me to pass upon its validity, nor shall I attempt to do so. That is now being done by the supreme court. I will consider its provisions on the assumption that it is valid.

In the first place, it does not confer any powers upon Paterson. Its powers are vested in a board of commissioners.

In the second place, it is not, *in terms,* mandatory. Section 4 provides that the board "is hereby given full power and authority to make, construct, maintain and operate intercepting, main, trunk and outlet sewers," &c. Their authority to do any work is made by section 5 to depend upon the result of an investigation by them "whether the discharge into New York bay is likely to pollute the waters of said bay within the jurisdiction of the State of New York to such an extent or in such a degree as to cause a nuisance to persons or property within said state." They are to present the result of their investigation to the governor, with their opinion and the reasons therefor, and thereupon the same are to be considered by the governor and the attorney-general. No work is to be done unless the attorney-general shall in writing advise that no cause of action for damages or an injunction will arise in favor of the State of New York or its inhabit-

ants, and unless the governor shall in writing advise "that in his judgment it is safe and prudent to proceed with the work, due regard being had to all the risks and dangers of injunctive litigation."

Going no further, is it not manifest that an act so framed cannot be a bar to the present suit? In the first place, the work of construction cannot begin until the commissioners, the attorney-general and the governor each independently conclude that no cause of action for damages or an injunction will arise in favor of the State of New York or of any of its inhabitants.

In the second place, even if the permissive language of section 4 should be construed by the courts to be mandatory, a wide latitude is necessarily given to the commissioners as to the size of the sewers, their location and the time within which the work or any part of it shall be done. It may become necessary not only to construct a trunk or intercepting sewer, but also branch sewers. By section 5 it is made (*inter alia*) the duty of municipalities to cause their sewers "to be connected with and to be discharged into the sewers constructed by the sewerage commissioners when the same shall have been constructed and at the places which shall have been designated for that purpose by the sewerage commissioners." Whether the respective municipalities will discharge all or only a part of their sewage into the sewers thus built, will depend upon their size and location, and, to some extent at least, upon the judgment of the commissioners. By section 20 these commissioners are vested with powers, exclusive of all other boards, to protect the rivers of the sewerage district from pollution, and they *may* prohibit the discharge of any sewage into such rivers, and they *may* apply for an injunction, but whether they will or not, will depend upon what they themselves may have been able to accomplish with the funds at their disposal.

There is nothing in this act which indicates that at any definite future period Paterson must or will altogether cease to empty its sewage into the Passaic. All that can be said is that there is a greater likelihood now, than at any previous period, that at some time in the future the pollution of the river will cease, either in whole or in part. To say that because of this

likelihood of something being done at some indefinite future
period by the commissioners, Paterson will, in the meanwhile,
have the right to appropriate to itself the property of others
without paying for it, is to advance a proposition contrary to
all legal principle.

If Paterson were able to name some day certain after which
it would cease to injure the complainants, questions might
arise in reference to the *quantum* of compensation that are not
now before the court. If the day named were a short one, it
might even be open to discussion whether, in view of the delay
in instituting these proceedings, any compensation, based upon
the notion of an appropriation of private property for public
use, should be given in this court;—whether, as counsel argues,
the complainants should not be left to their actions at law.
But as the act of 1903 stands, and as the facts are presented by
the bill, no foundation for any such argument exists.

In the next place, it is contended that it does not appear that
certain of the complainants did not become the owners of their
lands after the diminution in the value thereof or of the
greater part thereof had already taken place, and as to Garret
Terhune that it appears affirmatively that he *did* become the
owner of his land after such diminution. I fail to see the force
of this objection. The nuisance alleged is a continuing and
increasing one. Every continuance of a nuisance is held to be a
fresh one, and therefore a fresh action will lie. *Sedgw. Dam.*
(*8th ed.*) § *924; Delaware and Raritan Canal Co. v. Wright, 21
N. J. Law (1 Zab.) 469.* "A nuisance continues momentarily,
so that damages may be recovered up to the time of bringing
action." *Ib.* The court of errors and appeals have decided that
a wrong is being done to the complainants by the nuisance in
question. To prevent its continuance they say that the com-
plainants are entitled to an injunction unless the city will make
compensation for the diminution in value of their lands. This
wrong is that which the present owners are suffering and will
continue to suffer as long as the nuisance lasts.

How much compensation any particular owner may be enti-
tled to, is now immaterial. If entitled to any, he has a standing
in court.

· The twentieth cause of demurrer is as follows:

"It does not appear from the said amended bill that the complainants Jacob H. Van Saun, Peter I. Kipp, Samuel Phillips and John E. Mercilis or either of them have or has any such interest in any of the lands or property rights involved in this cause as makes them or either of them proper parties complainant therein, and they are therefore misjoined as such complainants."

The complainants above named are made parties because of the ownership of the lands by their respective wives. The legal question here presented, which is an important one, is involved in some doubt because of certain expressions to be found in the opinion, to which I will refer. It was intimated on the argument that an appeal would be taken, whatever the decision on the other questions in controversy, and if taken it will afford an opportunity of setting this question at rest.

That it may be clearly presented, I may be pardoned if I quote some elementary law. ˙ Before issue born, the husband, by the common law, had, in his wife's land, an estate of freehold during their *joint* lives. "Though by our law, it is said in a note by Hargrave to *Coke's Littleton (Co. Litt. 326a)*, a woman does not now communicate her rank or titles of honor to her husband, yet the freehold or right of possession of all her lands of inheritance vests in him immediately upon the marriage." After issue, born alive, capable of inheriting the estate, the husband acquired an estate of freehold which continued for his *own* life. It was termed an estate by the curtesy initiate during his wife's life, and it became consummate on her death. What the Married Woman's act did was to deprive the husband of the freehold during his wife's life. *Naylor* v. *Field, 29 N. J. Law (5 Dutch.) 287.* He no longer held a freehold estate in possession. It did not affect the estate which he took after her death. Upon that event he became entitled to a freehold interest in possession for his own life. Of this estate his wife could not by will or deed deprive him. I have never been able to understand why the husband has not, under these circumstances, an estate in remainder in his wife's land, which is as completely vested in him as any vested estate in remainder for life is ever vested in

any remainderman.  There is this contingency attending them
both, viz., that the remainderman may die in the lifetime of the
prior tenant, in which case he may not enjoy his tenancy.  But
if there be anything settled at common law, it is that this con-
tingency or possibility alone does not, in the case of a remain-
derman, make his remainder what is technically known as a
contingent remainder.

Now an elementary rule of equity pleading is that all persons
materially interested, either legally or beneficially, in the sub-
ject-matter of the suit must be made parties to it.  This rule, in
its application to the situation here presented, is thus stated in
*Story Eq. Pl.* § *165.*  He says:

"Upon similar grounds, where there are divers persons, having in suc-
cession an interest in particular property as A for life and B in re-
mainder, then if a bill be filed to transfer the property or in any other
manner to touch the rights and interests of all the parties, they must all
be made parties to the bill."

and see, also, sections *144, 147.*

It would seem, therefore, clear that after issue born the hus-
band has such an interest as would make him a necessary party
to any suit that might touch or affect his interest in his wife's
land after her death.  Vice-Chancellor Dodd applied the rule in
*Tunnard* v. *Littell, 23 N. J. Eq.* (*8 C. E. Gr.*) *269,* and quoted
from the opinion of Chancellor Green in *Johnson* v. *Vail, 14
N. J. Eq.* (*1 McCart.*) *428,* the following:  "There are num-
berless cases in which the wife has been allowed, through the
medium of her *prochein amy,* to sue her husband in respect of
her separate property; but I have not been able to find any case,
either at law or in equity, in which she has been allowed to sue
or be sued by a stranger merely, in respect of her separate prop-
erty, without her husband being plaintiff or defendant."

Chancellor Runyon, in *Casiner* v. *Sliker, 43 N. J. Eq.* (*16
Stew.*) *8,* overruled a demurrer to a bill for partition brought
by the wife alone.  The ground of demurrer was that the hus-
band was not made a party.  If the bill, as would seem probable,
showed merely that the husband was *in esse,* and did not show
that there was issue born alive, this ruling was clearly right,

and the reasoning on which it was based was sound. The freehold estate for their joint lives which the husband had at common law, immediately upon the marriage and before the birth of issue, was destroyed *in toto* by the Married Woman's act. Consequently it did not appear that the husband had any interest. Birth of issue could not be presumed. As by force of section 11 of that act, the wife was permitted to maintain an action in her own name, and without joining her husband, for the protection and recovery of *her* property, real as well as personal, it followed, as a matter of course, that her husband was not a necessary party to the suit, for he did not have, or, to speak more accurately, was not shown to have had any interest. But if it was intended to go further and to hold that even if it had appeared that there was issue born, the husband was not a necessary party, then a different question would have arisen, viz., was a husband, having an interest the equivalent of a vested estate in remainder for life, a necessary party in respect of that interest?

The chancellor relied upon *Porch* v. *Fries, 18 N. J. Eq. (3 C. E. Gr.) 204.* There Samuel Fries, who had married Martha, an infant, joined with her in a demise of timber lands for a term of years, with the privilege of cutting wood and timber thereon. She died before she became of age, and the lessees had felled some timber before her death. Upon that event the complainants, her heirs-at-law, filed a bill for an injunction to restrain the further cutting of timber. It was held, *inter alia,* that because she was an infant her lease was void; that the growing timber was a part of the realty of which her husband in his character of guardian could not dispose, and that as husband he had no estate in her land during her life, although he took as tenant by the curtesy at her death. It was held accordingly that inasmuch as an estate by the curtesy consummate was only an estate for life, and inasmuch as a tenant for life could not commit waste, and therefore could not authorize others to commit it, the complainants were entitled to an injunction. The bare statement of this case shows that it is only an authority for the proposition that the Married Woman's act is, in the language of Chancellor Zabriskie in that case, "inconsistent with

the estate by the curtesy initiate," but not with the curtesy con-
summate. This has become a settled rule of property in this
state. Said Judge Depue, in *Cushing* v. *Blake, 30 N. J. Eq. (3
Stew.)* '*697:* "The Married Woman's act most effectually makes
the estate of the wife her separate estate, and yet it has not abol-
ished the husband's curtesy after her death." It is very evident,
therefore, that *Porch* v. *Fries* is not an authority for the posi-
tion that after the birth of issue the husband is not a proper
party to a suit which will affect his *own* interest. It dealt with
no such question.

*Young* v. *Young, 45 N. J. Eq. (18 Stew.) 27*, was also de-
cided by Chancellor Runyon. He there held that a married
woman might maintain a suit for a specific performance of a
contract to convey land to her, in her own name, without join-
ing her husband. This decision is sustainable on the theory
that the husband has no interest until conveyance made. Under
our statute it is within the power of the wife to enforce or
refuse to enforce the contract and to enforce it either at law or
in equity, as she may elect.

In *Barrett* v. *Doughty, 25 N. J. Eq. (10 C. E. Gr.) 379*, on
a bill filed by husband and wife to obtain a reconveyance of
land conveyed, the same chancellor, on the principle that I will
refer to presently, ruled that the husband should be made de-
fendant instead of complainant. He made substantially the
same ruling in *Paulison* v. *Van Iderstine, 28 N. J. Eq. (1 Stew.)
306.*

The last two cases do not touch the question under considera-
tion. They rest upon the authority of *Johnson* v. *Vail, 14 N.
J. Eq. (1 McCart.) 423*, and are decided upon the principle
there laid down. That was a case in which the wife by her
husband and next friend filed a bill for the protection of her
separate property against the creditors of the husband. The
wife was the owner of a farm in her own right and the sheriff,
by the direction of an execution creditor of the husband, had
levied upon the growing crops. It was objected that the hus-
band, who had appeared only as next friend to his wife, was a
necessary party to the bill. Chancellor Green held that he was
a necessary party. He also held that he should be joined as

defendant and not as complainant, on two grounds—*first,* because if husband and wife joined as co-complainants or co-defendants it would be considered as the suit or defence of the husband alone and would not prejudice a future claim by the wife, in respect of her separate interest, and she would not be bound by any of the allegations therein in any future litigation; *second,* because persons having adverse interests ought not to join as co-complainants, and in the case under consideration the interest which the creditor claimed as being in the husband was adverse to the claim of the wife. The reasons for this are so fully stated in that case and in *Wake* v. *Parker, 2 Keen 73,* that it is unnecessary to repeat them.

Another case is *Bristol* v. *Skerry, 64 N. J. Eq. (19 Dick.) 624.* It was there held by Vice-Chancellor Grey, principally on the authority of *Johnson* v. *Vail,* that on a bill by husband and wife to restrain the defendants from raising a dam and causing the waters of a stream to flow back upon the wife's land, the husband was not a proper party complainant, but was a proper, though not a necessary, party defendant.

These are all the cases in our equity reports which appear to bear upon the question. There are three cases at law which should be mentioned. The first is *Ross* v. *Adams, 28 N. J. Law (4 Dutch.) 160.* Land of the wife conveyed to her after marriage, and after the passage of the Married Woman's act, had been condemned for the purposes of a railroad, and the money had been paid into court. The question was how it should be disposed of. The supreme court held, among other things, that the clerk of the court should calculate the value of the husband's interest, *i. e.,* the present value of the estate by the curtesy which would have come to him at his wife's death had the land not been condemned. The case was reversed in the court of errors and appeals, *34 N. J. Law (4 Vr.) 505,* not upon the ground that if the husband had an estate by the curtesy he was not entitled to a part of the money, but because, upon the proper construction of the deed, the wife took only a life estate, there being no words of inheritance in the granting part of it. In *State* v. *Hulick, 33 N. J. Law (4 Vr.) 307,* under a statute which required the surveyors of highways to assess the damages which

the owner of any land taken would sustain, it was held by Judge
.Woodhull, on the authority apparently of *Porch* v. *Fries, supra,*
which, however, holds no such doctrine, that the surveyors were
right in not naming the husband as owner and in not assessing
damages either to him separately or to him and his wife jointly.
This decision would not accord with the prior decision of the
supreme court, to which I have just referred, if there was in the
case proof of issue born. The report does not show that there
was. If there was not, the two cases are entirely reconcilable.
In *Trade Insurance Co.* v. *Barracliff, 45 N. J. Law (16 Vr.)*
*543,* it was held by the court of errors and appeals that a hus-
band who with his wife was in the occupation and enjoyment of
her real estate, in which he had an inchoate right of curtesy, had ·
an insurable interest therein. Mr. Justice Dixon, in his opinion,
quotes as supporting his view the case of *Ross* v. *Adams.*

In view of this course of decision, I think it may be affirmed
that it has never yet been expressly decided that *after issue born*
the husband is not a necessary party in equity to any suit which
touches or affects his right to curtesy after his wife's death. To
so hold would be to create an exception to the general rule re-
garding parties which could not be sustained on principle, and
which might in some cases lead to the destruction of the right.

Coming to the case in hand, I think the demurrer must be
sustained. There is no allegation of issue born alive, capable of
inheriting the estate. Had there been such an allegation, I think
it would have appeared that the husbands had an interest in the
controversy and that they were necessary parties. The bill as it
stands does not show any interest on their part. If it should,
then the correct practice would be to make the husbands defend-
ants, because the suit relates to the separate estates of their wives.
In the case in which this was held (*Johnson* v. *Vail, supra*),
Chancellor Green further declared that the wife's bill should be
exhibited in the name of her next friend. But this was said in
the year 1862 and before the enactment of section 11 of the
Married Woman's act. By the explicit language of that section·
she is authorized to maintain an action in her own name "for
the recovery and protection of her property *as if she were an*
*unmarried woman."* This statutory authority clearly does away
with the necessity of appearing by next friend.